# EXHIBIT 1

ELECTRONICALLY FILED - 2019 Jul 25 1:46 PM - HAMPTON - COMMON PLEAS - CASE#2017CP2500348

| | | |
|---|---|---|
| STATE OF SOUTH CAROLINA | ) | IN THE COURT OF COMMON PLEAS |
| | ) | FOURTEENTH JUDICIAL CIRCUIT |
| COUNTY OF HAMPTON | ) | |
| | ) | |
| Jessica S. Cook, Corrin F. Bowers & Son, Cyril B. Rush, Jr., Bobby Bostick, Kyle Cook, Donna Jenkins, Chris Kolbe, and Ruth Ann Keffer, on behalf of themselves and all others similarly situated, | ) ) ) ) ) ) | CASE NO. 2017-CP-25-348 |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| South Carolina Public Service Authority, an Agency of the State of South Carolina (also known as Santee Cooper); W. Leighton Lord, III, in his capacity as chairman and director of the South Carolina Public Service Authority; William A. Finn, in his capacity as director of the South Carolina Public Service Authority; Barry Wynn, in his capacity as director of the South Carolina Public Service Authority; Kristofer Clark, in his capacity as director of the South Carolina Public Service Authority; Merrell W. Floyd, in his capacity as director of the South Carolina Public Service Authority; J. Calhoun Land, IV, in his capacity as director of the South Carolina Public Service Authority; Stephen H. Mudge, in his capacity as director of the South Carolina Public Service Authority; Peggy H. Pinnell, in her capacity as director of the South Carolina Public Service Authority; Dan J. Ray, in his capacity as director of the South Carolina Public Service Authority; David F. Singleton, in his capacity as director of the South Carolina Public Service Authority; Jack F. Wolfe, Jr., in his capacity as director of the South Carolina Public Service Authority; Central Electric Cooperative, Inc.; Palmetto Electric Cooperative, Inc.; South Carolina Electric & Gas Company; SCANA Corporation, and SCANA Services, Inc., | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | **FIFTH AMENDED CLASS ACTION COMPLAINT** |
| | ) | |
| Defendants. | ) | |

ELECTRONICALLY FILED - 2019 Jul 25 1:46 PM - HAMPTON - COMMON PLEAS - CASE#2017CP2500348

## PARTIES AND JURISDICTION

1.      Plaintiff Jessica Cook is a resident of Hampton County and owns property in Hampton County. Mrs. Cook purchases her power directly from Defendant Palmetto Electric Cooperative, Inc. ("Palmetto").

2.      Plaintiff Corrin F. Bowers & Son is a resident of Hampton County and owns property in Hampton County. Corrin F. Bowers & Son purchases its power directly from Edisto Electric Cooperative, Inc.

3.      Plaintiff Cyril B. Rush, Jr. is a resident of Richland County and owns property in Clarendon County. Mr. Rush purchases his power for his Clarendon County property directly from Santee Electric Cooperative, Inc.

4.      Plaintiff Bobby Bostick is a resident of Charleston County and owns property in Charleston County. Mr. Bostick purchases his power directly from Berkeley Electric Cooperative, Inc.

5.      Plaintiff Kyle Cook is a resident of Aiken County and owns property in Aiken County. Mr. Cook purchases his power directly from Aiken Electric Cooperative, Inc.

6.      Plaintiff Donna Jenkins is a resident of York County and owns property in York County. Mrs. Jenkins purchases her power directly from York Electric Cooperative, Inc.

7.      Plaintiffs Chris Kolbe and Ruth Ann Keffer are citizens and residents of Horry County, South Carolina. Mr. Kolbe and Mrs. Keffer purchase their power directly from Santee Cooper.

8.      Defendant South Carolina Public Service Authority (also known as Santee Cooper) ("Santee Cooper") is state agency and public power utility created by the South Carolina General Assembly in 1934. Under current law, Santee Cooper "is a corporation owned completely by the

ELECTRONICALLY FILED - 2019 Jul 25 1:46 PM - HAMPTON - COMMON PLEAS - CASE#2017CP2500348

people of the State" for a "public purpose" and is operated "for the benefit of the all the people of the State." Santee Cooper has its principal place of business in South Carolina and is engaged in the business of, among other things, the direct sale and transmission of electric power to retail customers in Berkeley, Georgetown, and Horry counties, and to Defendant Central Electric Power Cooperative, Inc., which in turn sells power to the state's 20 distribution cooperatives (collectively the "Distribution Cooperatives").

9.      Defendants W. Leighton Lord, III, William A. Finn, Barry Wynn, Kristofer Clark, Merrell W. Floyd, J. Calhoun Land, IV, Stephen H. Mudge, Peggy H. Pinnell, Dan J. Ray, David F. Singleton, and Jack F. Wolfe, Jr. are current and/or former members of the Santee Cooper board of directors involved in the decisions and conduct at issue in this case. Members of Santee Cooper's board of directors are referred to collectively herein as the "Santee Board."

10.      Defendant Central Electric Power Cooperative, Inc. ("Central") is a South Carolina corporation with its principal place of business in Columbia, South Carolina. At all times relevant to this Complaint, Central purported to operate solely for the benefit of its customers, and its mission has been to provide "reliable, long-term, and stable supply of power, which accommodates growth at the lowest possible cost consistent with good utility practices."[1] Central conducts business in all 46 counties in the state, including Hampton County.

11.      Defendant Palmetto Electric Cooperative, Inc. ("Palmetto") is a South Carolina corporation operating and owning property in Hampton County, South Carolina.

12.      Palmetto is one of 20 Distribution Cooperatives. Collectively, the Distribution Cooperatives sell power to customers in all 46 counties in the state.

13.      Defendant South Carolina Electric & Gas Company ("SCE&G") is a wholly owned

---

[1] www.cepci.org/mission-and-values (last visited April 23, 2019).

and controlled subsidiary of Defendant SCANA Corporation ("SCANA"), has its principal place of business in South Carolina, and is engaged in the business of, among other things, the generation of electric power. SCE&G regularly conducts business and owns property in Hampton County.

14.    Defendant SCANA has its principal place of business in South Carolina and is engaged in the business of holding several utility assets, including SCE&G. SCANA and SCE&G control the assets of SCE&G in Hampton County for the benefit of SCANA.

15.    Defendant SCANA Services, Inc. ("SCANA Services") has at all times relevant to this complaint been a South Carolina corporation and a primary subsidiary of SCANA. During the construction of two new nuclear reactors (Unit 2 and Unit 3) at the V.C. Summer facility in Fairfield County, South Carolina (the "Project"), SCANA Services employed the Project's professional staff who were charged with supervision and management of the Project and paid the Project's professional staff for work related to the Project.

16.    Defendants, collectively and individually, are in the business of providing electric service to customers throughout South Carolina. The service that is the subject of this Fifth Amended Complaint is provided and the contracts are performed, in whole or in part, in Hampton County.

17.    The above-named Plaintiffs are collectively referred to herein as "Plaintiffs." All Plaintiffs receive their power from Santee Cooper, either directly or through Central and one of the Distribution Cooperatives. Jessica Cook, Corrin F. Bowers & Son, Rush, Bostick, Kyle Cook, and Donna Jenkins are collectively referred to herein as the "indirect Plaintiffs." Plaintiffs Kolbe and Keffer are collectively referred to herein as the "direct Plaintiffs."

18.    This Court has jurisdiction over this matter, and venue for this action is appropriate.

ELECTRONICALLY FILED - 2019 Jul 25 1:46 PM - HAMPTON - COMMON PLEAS - CASE#2017CP2500348

ELECTRONICALLY FILED - 2019 Jul 25 1:46 PM - HAMPTON - COMMON PLEAS - CASE#2017CP2500348

## SUBSTANTIVE ALLEGATIONS

19.     This action arises as a result of Santee Cooper and SCE&G's collective decision to construct and abandon construction of the Project.

20.     Santee Cooper is South Carolina's largest producer of electricity. SCE&G is South Carolina's second largest producer of electricity.

21.     Santee Cooper distributes its power to all 46 counties in the state of South Carolina. The majority of this power funnels through the vessel of Central and the Distribution Cooperatives. Santee Cooper's remaining power is sold directly to customers, including the direct Plaintiffs. The indirect Plaintiffs purchase their power indirectly from Santee Cooper through Central and the Distribution Cooperatives.

22.     In or around 2005, SCE&G first considered increasing the nuclear power in its generation mix following passage of the Clean Energy Act, which promised, among other things, lucrative tax incentives to utilities who added nuclear generation subject to a specific timeline.

23.     While SCE&G was interested in adding nuclear generation to its own mix, nuclear construction was historically more expensive than other types of generation construction. SCE&G thus sought a partnership with Santee Cooper, the state's largest electricity producer, and SCE&G's former partner in the construction of V.C. Summer 1.

24.     At the same time, SCE&G was considering the specific design for its future nuclear generation, including options made by veterans in the nuclear construction industry, such as General Electric. However, SCE&G ultimately selected the AP1000—a first of its kind prototype utilizing an untested modular technology and designed by the nuclear branch of Westinghouse Electric Company, LLC ("Westinghouse"), a subsidiary of the Japanese firm Toshiba. In addition to control over design of the reactors, Westinghouse would assume control over construction of

ELECTRONICALLY FILED - 2019 Jul 25 1:46 PM - HAMPTON - COMMON PLEAS - CASE#2017CP2500348

the reactors, which was outside of Westinghouse's traditional purview.

25.    Sometime prior to 2007, Santee Cooper and SCE&G became partners in and co-owners of the now abandoned Project. Santee Cooper is a 45 percent partner, and SCE&G is a 55 percent partner.

26.    Pursuant to the respective roles assumed by the parties on the Project, both SCE&G and Santee Cooper were charged with project management and oversight, and both represented they would operate in accordance with the accepted industry standards associated with construction of a nuclear mega-project and good utility practices.

27.    Upon information and belief, Santee Cooper's involvement in the pre-construction, construction, and post-construction phases of the Project was a material and necessary element of SCE&G's decision to move forward with the Project. By way of example, the same day Santee Cooper announced it was suspending its involvement with the Project, SCE&G followed suit, citing Santee Cooper's withdrawal from the Project as a primary motivation for abandoning the Project.

28.    At all times relevant to this Complaint, Santee Cooper, SCANA, SCE&G, and SCANA Services, by and through employees such as Lonnie Carter ("Carter") (Chief Executive Officer of Santee Cooper), Kevin Marsh ("Marsh") (Chief Executive Officer and Chairman of the Board of SCANA), Stephen Byrne ("Byrne") (Executive Vice President of SCANA and President for Generation and Transmission and Chief Operating Officer of SCE&G), and Jimmy Addison ("Addison") (Chief Financial Officer of SCANA), stated the Project was to benefit customers with economic and reliable energy made necessary by what Santee Cooper, SCANA, and SCE&G represented to the public and authorities was a need for additional base load capacity.

29.    However, as early as 2009, contrary to public assertions made by representatives of

ELECTRONICALLY FILED - 2019 Jul 25 1:46 PM - HAMPTON - COMMON PLEAS - CASE#2017CP2500348

SCE&G and Santee Cooper regarding the future need for increased base load, Defendants collectively recognized the additional 2,200 megawatts of base load added by the Project was unnecessary for the populations Defendants served. Accordingly, from 2009 on, Defendants knew their customers were paying for projects that were unnecessary for the provision of reliable electric service.

30.     In a deviation from prior utility practice, where the utility would defer recovering costs associated with construction financing until a plant was generating power, both SCE&G and Santee Cooper shifted 100% of the financing costs associated with the Project onto customers.

31.     In April 2007, after Santee Cooper, SCANA, and SCE&G had agreed and arranged to deviate from the historical and normal protocol and methods of charging customers for "used and useful" assets, Santee Cooper, SCANA, and SCE&G chose to expand the proposed scope of the Project from one nuclear reactor to two. At the time of the expansion of the Project, there already existed questions of whether the additional load capacity was necessary.

32.     In 2008, Santee Cooper and SCE&G signed an Engineering, Procurement, and Construction Contract ("EPC") with a consortium including lead contractor Westinghouse. The EPC called for Unit 2 to be completed by April 2016 and Unit 3 to be completed by January 2019 at a combined cost of approximately $12 billion.

33.     The EPC was a preeminent exhibit in the administrative hearing before the South Carolina Public Service Commission ("PSC"), where SCE&G sought a "Certificate of Need" ("CON") associated with the Project. (PSC Docket No. 2008-196). During this hearing, Marsh represented the Project was supported by the energy needs of the state. Marsh knew if the PSC approved the CON, Santee Cooper's customers would be responsible for 45% of the Project cost.

34.     During the hearing before the PSC, in addition to touting the benefits of the EPC,

ELECTRONICALLY FILED - 2019 Jul 25 1:46 PM - HAMPTON - COMMON PLEAS - CASE#2017CP2500348

Marsh represented to licensing authorities that SCE&G would exercise significant control over the Project. Based upon Marsh's representations on behalf of SCE&G, the PSC found:

> [I]n any event, regardless of the terms of the EPC contract, SCE&G has ultimate responsibility for the proper execution of that contract and the construction of the units, including appropriate quality control and quality assurance.

Order No. 2009-104(A), entered March 2, 2009.

35.     In further testimony before the PSC, Marsh addressed how the Defendants would collectively manage significant risks related to cost overruns and delays on the project, stating:

> The business processes and structures for oversight group are being formalized at this time.  In all, we estimate more than 50 people will be assigned to this task.  At the center of this structure will be a dedicated group of SCE&G personnel that will monitor each aspect of the construction process on a day-to-day basis and will report progress, issues and variances to an executive steering committee that includes me as SCE&G's president, and a senior executive from Santee Cooper and to the SCANA board of directors.

36.     As a result of representations made before the PSC, Marsh, Byrne, and Addison, along with other SCANA, SCE&G, and SCANA Services employees, were charged with supervision, oversight, and management of the Project for SCE&G and Santee Cooper customers alike.

37.     In March 2008, SCE&G, SCANA, and Santee Cooper represented to federal licensing authorities that the utilities would be given reports based on day-to-day monitoring of every aspect of the Project.

38.     Pre-nuclear construction of the Project began in 2009.

39.     However, by 2010, both SCE&G and Santee Cooper knew additional baseload was unnecessary.

40.     In addition, by 2010, natural gas prices had stabilized and legislation surrounding

ELECTRONICALLY FILED - 2019 Jul 25 1:46 PM - HAMPTON - COMMON PLEAS - CASE#2017CP2500348

carbon emissions had stalled, further eroding the purported need for the Project.

41.    As the Project was set in motion, money flowing from Santee Cooper and its customers began to be spent on the materials and the construction including, but not limited to, financing costs and expenses, despite the fact that no engineer ever sealed the design specifications for the AP-1000 design.

42.    Beginning in or around 2010, Santee Cooper began to publicly search for a third party to purchase as much as 50% of its ownership in the Project. Meanwhile, Santee Cooper continued to fund a substantial portion of its share of the Project through customer funds.

43.    In 2011, Santee Cooper allowed, and SCE&G assumed responsibility for, negotiations with prospective purchasers of Santee Cooper's ownership interest. SCE&G's terms of sale precluded these prospective purchasers from exercising any control over the Project, even as the purchasers were potentially agreeing to pay significant funds for this interest. SCE&G's terms also precluded prospective purchasers from utilizing federal funding to cover costs associated with the Project.

44.    Santee Cooper's attempts to relieve itself of over 50% of its ownership interest continued in earnest until January 2014, when the lone remaining interested third party, Duke Power Corporation, finally halted the negotiations. According to press releases, the negotiations ultimately broke down when SCE&G and Duke Power were unable to agree on terms.

45.    Following the departure of Duke Power as an interested purchaser, SCE&G and Santee Cooper entered into a compromise whereby SCE&G agreed to purchase 5% of Santee Cooper's ownership interest in the Project, contingent upon Project completion. The agreement did not require SCE&G to pay any money until after substantial completion. As consideration for the agreement, Santee Cooper was foreclosed from selling any of the remainder of its interest in

ELECTRONICALLY FILED - 2019 Jul 25 1:46 PM - HAMPTON - COMMON PLEAS - CASE#2017CP2500348

the Project.

46.     To execute the contract to sell 5% of its ownership interest to SCE&G, the Santee Cooper board issued a resolution determining the 5% interest was unnecessary to the utility operations.  Despite this finding, the board nevertheless agreed Santee Cooper would continue to pay its full share of the costs associated with the Project.

47.     While Santee Cooper was attempting to reduce its ownership interest, the Project was plagued by a litany of delays, cost increases, and setbacks.

48.     Yet, rather than enforcing appropriate mitigation efforts, executing upon liquidated damages, or otherwise engaging in any efforts to determine the continued viability of the Project, Santee Cooper and SCE&G gave Westinghouse "full notice to proceed" under the EPC in 2012.

49.     Against this backdrop, in 2013, and again in 2014, Santee Cooper continued to issue copious amounts of debt related to the Project, totaling over $1.3 billion in 2014 alone.

50.     In an October 2015 amendment to the contract with Westinghouse, the parties negotiated a fixed price structure option to deal with the cost overruns and delays (the "Fixed Price Contract"). Santee Cooper's 2015 "Chairman and CEO Letter" stated: "The amended agreement also gives Santee Cooper and SCE&G more certainty on price and schedule going forward. This is good news for us and for our customers."

51.     The Fixed Price Contract set new timelines for construction completion as follows: Unit 2—August 31, 2019, and Unit 3—August 31, 2020. The Fixed Price Contract capped total costs after June 30, 2015 at $6.082 billion, with Santee Cooper's 45 percent share being approximately $2.737 billion.

52.     The cost overruns and delays continued unabated as a direct result of the Project's mismanagement. The following list provides an alarming (yet non-exhaustive) account of the

ELECTRONICALLY FILED - 2019 Jul 25 1:46 PM - HAMPTON - COMMON PLEAS - CASE#2017CP2500348

Project's mismanagement:

a.    Despite making promises and representations to the contrary, neither Santee Cooper nor SCE&G ever received from the Project contractors an "integrated project schedule" ("IPS") for the Project, the master planning document needed to coordinate the materials, work, scheduling, and costs associated with such a large, complicated construction project. Without an IPS, the cost and scheduling projections could never be ascertained.

b.    Despite the absence of an IPS, Santee Cooper and SCE&G approved various construction and financial agreements associated with the Project, charged increased rates attributable to the Project, and, through spokespeople, including Carter, Marsh, Byrne, and Addison, made positive and misleading public and private statements regarding the Project's progress and future.

c.    As Santee Cooper attempted to rid itself of a large portion of the Project, SCE&G, led by Marsh, prevented the sale;

d.    Ultimately, SCE&G agreed to purchase a limited future ownership interest in the Project from Santee Cooper, yet SCE&G paid nothing toward this ownership interest, and instead, Santee Cooper customers continued to fund this partial ownership interest, all while SCE&G knew or should have known of the Project's imminent failure;

e.    Even after entering into an agreement for SCE&G's purchase of a 5% ownership interest in the Project, Santee Cooper continued to charge customers 100% of the costs associated with Santee Cooper's 45% share of the Project;

f.    In 2013, Santee Cooper and Central renegotiated the Coordination Agreement governing the relationship between the entities for the express purpose of increasing Santee Cooper's access to favorable financing for the Project, all while knowing the Project was unnecessary and was not in adherence with any schedule or design.

g.    In the 2013 revision to the Coordination Agreement, Santee Cooper and Central agreed the Distribution Cooperatives would remain responsible for the failing Project.

h.    As early as 2011, Santee Cooper and SCE&G were deeply concerned about cost overruns and design delays that put "potentially unrecoverable stress" on the originally promised schedule. Meanwhile, Byrne was telling Wall Street: "We hear about nuclear project's being over budget or costs being rampant. I want to reinforce that is not the case with this project."

i.    From 2013 through 2014, SCE&G and Santee Cooper, concerned over the significant and ever-increasing time and expense of the Project, sought to assess the actual estimate to complete the Project. These estimates all indicated the Project was persistently behind schedule and over budget. Despite these estimates, SCE&G and Santee Cooper, by

ELECTRONICALLY FILED - 2019 Jul 25 1:46 PM - HAMPTON - COMMON PLEAS - CASE#2017CP2500348

and through Carter, Marsh, Byrne, and Addison, continued to assure the public of the viability of the Project and of its importance to the generation mix of the two utilities.

j.     In early 2015, Santee Cooper and SCE&G hired Bechtel, the nation's largest construction and civil engineering firm, to audit the Project and provide input and recommendations. In a report dated February 2016, Bechtel issued its findings (the "Bechtel Report"). Among other things, the Bechtel Report sounded the alarm regarding the lack of an IPS, noted fundamental flaws in the Project's design, observed the contractor was not "commercially motivated" to finish the job, criticized SCE&G's performance as operator, highlighted waste and inefficiency in the supply and storage of expensive construction material, and lamented poor overall morale on the part of contractors and workers. Santee Cooper and SCE&G concealed and failed to produce the Bechtel Report to regulators, the Governor's Office, the General Assembly, the press, and other interested parties until in or around September 2017 after the Project's abandonment and only in the face of direct threats from Governor McMaster. Despite the Bechtel Report's findings, Santee Cooper and SCE&G entered into the Fixed Price Contract, incurred further financial commitments and obligations, continued to charge increased rates attributable to the Project, and continued to make positive and misleading public and private statements regarding the Project's progress and future.

k.     E-mail correspondence between and amongst Santee Cooper, SCE&G, the Project's contractors, consultants, and other parties from 2013 through 2017 reveal significant strife, mistrust, and concern over transparency, mismanagement, and misrepresentations. The e-mails further reveal Santee Cooper's and SCE&G's concern that Westinghouse bankruptcy filings were imminent years before they were ultimately filed. In fact, in June 2016, SCE&G hired bankruptcy attorneys to evaluate and plan for these filings. (Westinghouse ultimately filed for bankruptcy protection on March 29, 2017.) Despite these e-mail communications expressing concerns about the Project, Santee Cooper and SCE&G nonetheless entered into the Fixed Price Contract, incurring huge financial commitments and obligations, continued to charge increased rates attributable to the Project, and continued to make positive and misleading public and private statements regarding the Project's progress and future.

l.     Despite the many issues plaguing the Project beginning as early as 2011, Defendants never sought to determine whether the Project remained viable.

m.     Santee Cooper and its Board, SCANA, SCE&G, SCANA Services, Carter, Marsh, Byrne, and Addison were aware the Project contractors and others involved in the construction habitually utilized construction and engineering plans that had not been stamped and approved by South Carolina licensed professional engineers and other professionals, and they negligently allowed this to continue or turned a blind eye to it. Further, SCANA, SCE&G, SCANA Services, and Santee Cooper had no policies governing how the Project was to operate.  Not surprisingly, numerous design and engineering flaws emerged over the life of the failed Project, which delayed construction, increased costs, and presented major safety concerns.  These design and engineering flaws could have been prevented by SCANA, SCE&G, SCANA Services, Marsh, Byrne, and

ELECTRONICALLY FILED - 2019 Jul 25 1:46 PM - HAMPTON - COMMON PLEAS - CASE#2017CP2500348

Addison with the robust oversight promised by Marsh in his 2008 PSC testimony.

n.    Governor McMaster wrote to Santee Board Chairman Leighton Lord in late 2017: "We continue to learn of instances in which Santee Cooper was made aware of critical information regarding the design, engineering, and construction of V.C. Summer . . .. It is clear that under your leadership and direction, Santee Cooper has failed to cooperate as required by providing the information necessary to resolve this crisis." Lord ultimately resigned.

o.    Central and Palmetto, as a Distribution Cooperative, were aware of the unnecessary nature of the Project and understood the base load needs of the state and the fact that the proposed project far exceeded any needs of their customers. It was not reasonable to begin the Project, even less reasonable to continue the Project before ground was broken, and reckless to permanently tie customers to the failing Project through the 2013 agreement with Santee Cooper.

53.    The funding that Santee Cooper customers provided for the voluntarily abandoned Project came out of Plaintiffs' pockets, flowed upstream, and into the now-abandoned property in Fairfield County and the pockets of Defendants.

54.    Central lies in between Santee Cooper and the Distribution Cooperatives in the distribution chain. Central purchases power from Santee Cooper as the designated purchaser for the Distribution Cooperatives and their customers. Central is the largest customer of Santee Cooper and holds considerable influence on the decisions made by Santee Cooper. Central publicly purports to make decisions in the best interest of Distribution Cooperative customers, in accord with good utility practices.

55.    Central, in part because of its design and purpose, has express and implicit responsibilities to the distribution customers served by Santee Cooper, and those duties flow directly to and for the benefit of the customers of the Distribution Cooperatives.

56.    Central was consistently made aware of issues with the Project, but failed to suspend, modify, or otherwise alter Central's involvement in the Project.

57.    Disturbingly, Central and Palmetto, as a Distribution Cooperative, had ample opportunity to discover and protect their customers from the waste and mismanagement at the

ELECTRONICALLY FILED - 2019 Jul 25 1:46 PM - HAMPTON - COMMON PLEAS - CASE#2017CP2500348

Project.

58.      For example, the Central Board, which comprises two members from each Distribution Cooperative, reported significant dissatisfaction with Santee Cooper as early as 2012 during Santee's annual Central survey. Upon information and belief, this dissatisfaction was prompted in large part by Santee's continued increases to Central rates due to financing owed toward the Project.

59.      In light of Central's dissatisfaction, and in need of access to additional financing for the Project, in 2013, Central and Santee amended the Coordination Agreement. Through this amendment, Central required its member Distribution Cooperatives to permanently pay for the Project. Central further elected to exempt the Project from meaningful review regarding increased costs. Central entered into this 2013 Amendment despite knowledge of or with reckless disregard for the significant schedule delays and cost overruns that had plagued the Project for years.

60.      In October 2014, during a special meeting between the Santee Board and the Central Board, Central was made aware that the estimate to complete the Project far exceeded prior proposals. Despite this information, Central failed to act to suspend the Project or suspend the payments owed by indirect customers toward the Project.

61.      Worse yet, as the Project was teetering on extinction, Central directed approximately $175 million to the Project beyond what it was required to pay.

62.      SCANA, SCE&G, SCANA Services, Marsh, Byrne, and Addison owed and voluntarily assumed various duties and obligations to Santee Cooper's direct and indirect customers, including Plaintiffs, by playing a central role in the supervision and management of the Project and due to their special relationship with Santee Cooper on the Project. SCANA, SCE&G, SCANA Services, Marsh, Byrne, and Addison breached these duties and obligations, thus harming

ELECTRONICALLY FILED - 2019 Jul 25 1:46 PM - HAMPTON - COMMON PLEAS - CASE#2017CP2500348

Plaintiffs, in a number of particulars, including mismanaging the Project, failing to adequately supervise the Project and mitigate damages, failing to create effective quality controls and to otherwise use good utility practices, negligently preventing the sale of Santee's ownership interest to a third party, after 2014, knowingly shifting the cost associated with SCE&G's interest in the Project onto Santee Cooper customers, failing to adequately and competently staff the Project, and failing to stop the Project or consider halting the Project amidst a variety of issues, including the lack of need associated with the additional baseload.

63.     To date, Santee Cooper customers have financed debt totaling approximately $4.7 billion in pre-construction, capital, in-service, construction, interest, and other pre-operational costs associated with the Project. Santee Cooper has financed and continues to finance some or all of these costs through specifically tailored rate increases imposed by the Board and paid by its direct and indirect customers, including Plaintiffs.

64.     In fact, Santee Cooper has raised the electricity rates charged to its retail customers, including the direct Plaintiffs, at least five times to pay for pre-construction, capital, in- service, construction, interest, and other pre-operational costs associated with the Project. Most recently, Santee Cooper increased rates[2] by 3.7 percent in April 2016 and by another 3.7 percent in April 2017. Each of these rate increases were ratified by the Santee Board.

65.     At no point has Santee Cooper reduced the costs upon its customers by the 5% ownership interest that SCE&G agreed to purchase in 2014.

66.     At no point has SCE&G paid the Santee Cooper customers for continuing to fund SCE&G's 5% interest or otherwise agreed to take over these payments.

---

[2] The aforementioned rate increases charged to Santee Cooper's direct and indirect customers specifically tailored to pay for pre-construction, capital, in-service, construction, interest, and other pre-operational costs associated with the Project are referred to as the "increased rates."

ELECTRONICALLY FILED - 2019 Jul 25 1:46 PM - HAMPTON - COMMON PLEAS - CASE#2017CP2500348

67.    S.C. Code Ann. § 58-27-810 states: "Every rate made, demanded or received by any electrical utility or by any two or more electrical utilities jointly shall be just and reasonable."

68.    Santee Cooper's rate setting authority is governed by statute, namely S.C. Code Ann. §§ 58-31-30(13), -55(A)(3)(A), -360, subject to other applicable state and federal law.

69.    S.C. Code Ann. § 58-31-30(13) authorizes Santee Cooper:

> to fix, alter, charge, and collect tolls and other charges **for the use of their facilities** of, or **for the services rendered** by, or **for any commodities furnished** by, the Public Service Authority at rates to be determined by it, these rates to be at least sufficient to provide for payment of all expenses of the Public Service Authority, the conservation, maintenance, and operation of its facilities and properties, the payment of principal and interest on its notes, bonds, and other evidences of indebtedness or obligation, and to fulfill the terms and provisions of any agreements made with the purchasers or holders of any such notes, bonds, or other evidences of indebtedness or obligation.

(Emphasis added)

70.    S.C. Code Ann. § 58-31-55(A)(3)(a) imposed upon the Santee Board the duty to "preserv[e] . . . the financial integrity of [Santee Cooper] and its ongoing operation of generating, transmitting, and distributing electricity to wholesale and retail customers on a reliable, adequate, efficient, and safe basis, at just and reasonable rates, regardless of the class of customer."

71.    Under S.C. Code Ann. § 58-31-360, Santee Cooper:

> shall, fix, establish, maintain and collect rents, tolls, rates and charges **for the use of the facilities** of or **for the services rendered** or **for any commodities furnished** by the Public Service Authority, at least sufficient to provide for payment of all expenses of the Public Service Authority, the conservation, maintenance and operation of its facilities and properties and the payment of the principal of and interest on its notes, bonds, evidences of indebtedness or other obligations, and to fulfill the terms and provisions of any agreements made with the purchasers or holders of any such notes, bonds, evidences of indebtedness or obligations heretofore or hereafter issued or incurred. Provided, however, that prior to putting into effect any increase in rates the Public Service

ELECTRONICALLY FILED - 2019 Jul 25 1:46 PM - HAMPTON - COMMON PLEAS - CASE#2017CP2500348

> Authority shall give at least sixty days' notice of such increase to all customers who will be affected by the increase.

(Emphasis added).

72.     Santee Cooper has collected hundreds of millions of dollars in increased rates to finance pre-construction, capital, in-service, construction, interest, and other pre-operational costs associated with the Project. The increased rates will continue to be charged to Plaintiffs into the future as part of the existing rate structure.

73.     SCANA, SCE&G, Santee Cooper, and Central have reaped substantial funds from the Project due to costs incurred by Santee Cooper's direct and indirect customers. Profits for SCANA and SCE&G increased as the costs of the Project increased, creating an incentive for SCANA and SCE&G to spend indiscriminately, which Santee Cooper and Central allowed through their negligent failure to act with regard to the Project.

74.     Moreover, after January 2014, SCE&G agreed to purchase 5% of Santee Cooper's ownership in the Project.

75.     In shifting this ownership interest, Santee Cooper's board had to declare the 5% interest unnecessary for the provision of electric service to its customers.

76.     SCE&G and Santee nevertheless agreed Santee Cooper customers would continue to bear 100% of the cost associated with Santee Cooper's 45% share of the Project.

77.     This agreement therefore allowed Santee Cooper to avoid legislative scrutiny of its decision, and allowed SCE&G to avoid scrutiny over the shift by the PSC.

78.     Santee Cooper's direct and indirect customers, including Plaintiffs, will never see any use, service, commodity, or benefit from the Project, but will continue to bear the burden of costs associated with the Project through increased rates.

79.     Despite the numerous failures set forth above, Santee Cooper's executives,

ELECTRONICALLY FILED - 2019 Jul 25 1:46 PM - HAMPTON - COMMON PLEAS - CASE#2017CP2500348

including Carter, have received performance bonuses, incentive pay, retirement packages ("golden parachutes"), and other benefits associated with the Project. SCANA's and SCE&G's shareholders and executives have similarly reaped financial windfalls associated with the Project.  Indeed, at the behest of the SCANA Defendants, without approval from the Santee Cooper Board of Directors, Carter authorized Santee Cooper to use approximately $9 million of its customers' money for Project-related bonuses for SCANA executives.  Santee Cooper continued to pay bonuses for SCANA executives until August 31, 2017. *See* https://www.thestate.com/news/politics-government/article210782644.html (last visited April 23, 2019).

80.     As set forth herein, Defendants, individually and collectively, authorized and participated in the negligent mismanagement of the Project at the expense of customers. Plaintiffs were harmed as a direct and proximate result of this negligent mismanagement.

## CLASS ALLEGATIONS

81.     Under Rule 23, SCRCP, Plaintiffs bring this action on behalf of themselves and a class of all customers, both indirect and direct ("the Class"), initially defined as:

> All Santee Cooper residential, commercial, small industrial, and other customers, both direct and indirect, who paid utility bills that included rates calculated, in part, to pay pre-construction, capital, in-service, construction, interest, and other pre-operational costs associated with the V.C. Summer Nuclear Reactor Unit 2 and 3 Project from January 1, 2007, to the present.

82.     This class is logically divided into two subclasses, those who purchased power generated by Santee Cooper directly (the "Direct Subclass") and those who purchased power generated by Santee Cooper indirectly (the "Cooperative Subclass"). The Cooperative Subclass has a further subclass consisting of Palmetto customers ("the Palmetto Subclass").

83.     Excluded from the Class are:

ELECTRONICALLY FILED - 2019 Jul 25 1:46 PM - HAMPTON - COMMON PLEAS - CASE#2017CP2500348

a.      Santee Cooper, its legal representatives, elected officials, officers, directors, assigns, and successors;

b.      Wholesale customers of Santee Cooper, including Central, the Distribution Cooperatives, and their respective legal representatives, elected officials, officers, directors, assigns, and successors;

c.      SCANA, its legal representatives, elected officials, officers, directors, assigns, and successors;

d.      SCE&G, its legal representatives, elected officials, officers, directors, assigns, and successors;

e.      SCANA Services, its legal representatives, elected officials, officers, directors, assigns, and successors;

f.      The judge, magistrate, and any special master to whom this case is assigned, and any member of their immediate families; and

g.      To the extent the class certification order permits exclusion, all persons who timely submit proper requests for exclusion from the plaintiff class.

84.    The Class consists of hundreds of thousands of individuals and entities who are direct and indirect Santee Cooper customers. Thus, the Class is so numerous that joinder of all members is impracticable, thereby satisfying Rule 23(a)(1), SCRCP. The disposition of the claims of the members of the Class in a single class action will provide substantial benefits to all parties and to the Court.

85.    There are questions of law and fact common to Plaintiffs and the Class, thereby satisfying Rule 23(a)(2), SCRCP. These questions include, but are not limited to, the following:

a.      Whether Santee Cooper's series of rate increases during the interim of the Project were statutorily authorized.

b.      Whether Santee Cooper was statutorily authorized to collect advanced financing of nuclear costs from customers.

c.      Whether the Santee Board breached one or more statutory or fiduciary duties.

ELECTRONICALLY FILED - 2019 Jul 25 1:46 PM - HAMPTON - COMMON PLEAS - CASE#2017CP2500348

      d.      Whether Santee Cooper engaged in unconstitutional takings.

      e.      Whether Santee Cooper violated the due process rights of its customers.

      f.      Whether Defendants were negligent, grossly negligent, and reckless, in their management of the Project at Plaintiffs' expense.

      g.      Whether Santee Cooper breached its contractual obligations.

      h.      Whether Central breached its contractual obligations.

      i.      Whether Palmetto breached its contractual obligations.

      j.      Whether SCANA, SCE&G, SCANA Services, Marsh, Byrne, and Addison breached duties to Santee Cooper's direct and indirect customers in failing to provide sufficient supervision and oversight of the Project.

      k.      Whether Santee Cooper breached duties to its direct and indirect customers in failing to provide sufficient management and oversight of the Project, and project management.

      l.      Whether, as a direct and proximate result of Defendants' negligent, grossly negligent, and reckless failures with regard to the Project, Plaintiffs lost the use of property (Units 2 and 3) for which they paid.

      m.      Whether Plaintiffs sustained injuries as a result of the loss of use of property (Units 2 and 3) for which Plaintiffs paid.

      n.      Whether Defendants' conduct directly and proximately resulted in the loss of use of Plaintiffs' property, in that Defendants will never deliver, and Plaintiffs will never receive, Units 2 and 3.

86.      Resolution of these common questions in a single action will eliminate the risk of inconsistent and varying adjudications, and it will allow Class members to present their claims efficiently and share the costs of litigation, experts, and discovery.

87.      Plaintiffs' claims are typical of the claims of the members of the Class, thereby satisfying Rule 23(a)(3), SCRCP. Plaintiffs' claims arise from the same nucleus of operative facts and are intended to correct and prevent the same improper conduct that has impinged or will impinge identically upon Plaintiffs and members of the Class.

88.     The service contract(s) for Plaintiffs and Class members is the same or similar and conveys the same or similar rights.

89.     The legal relationship between Plaintiffs and Santee Cooper or the Distribution Cooperative from which power is purchased is the same or similar to the legal relationship between Santee Cooper or the Distribution Cooperatives and all of their customers. Plaintiffs consist of direct customers of Santee Cooper and indirect customers of Santee Cooper who are also customers of the Distribution Cooperatives, and each Plaintiff is fully able and properly offered to represent any additional subclass that may be necessary.

90.     The legal relationship between the Cooperative Subclass Plaintiffs and Central is the same or similar to that of all customers of the Distribution Cooperatives.

91.     The legal relationship between Mrs. Cook and Palmetto is the same or similar to that of all customers of Palmetto.

92.     Plaintiffs consist of both direct and indirect customers of Santee Cooper and together represent and are pursuing direct and indirect claims against Santee Cooper that are the same or similar to the claims of direct or indirect customers of Santee Cooper.

93.     The legal relationship between Plaintiffs and SCANA, SCE&G, and SCANA Services is the same or similar to the legal relationship between all customers purchasing power from Santee Cooper or the Distribution Cooperatives and SCANA, SCE&G, and SCANA Services.

94.     Similarly, Defendants have exhibited that they will act and have acted or refused to act in ways that are universal to the Class.

95.     Plaintiffs will fairly and adequately protect the interests of the Class, thereby satisfying Rule 23(a)(4), SCRCP. Plaintiffs' interests are coincident with and not antagonistic to

ELECTRONICALLY FILED - 2019 Jul 25 1:46 PM - HAMPTON - COMMON PLEAS - CASE#2017CP2500348

ELECTRONICALLY FILED - 2019 Jul 25 1:46 PM - HAMPTON - COMMON PLEAS - CASE#2017CP2500348

the interests of the members of the Class, and Plaintiffs are represented by experienced and able counsel who have previously litigated class actions. Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of the Class, and they have the financial resources and intellectual wherewithal to do so.

96.     Plaintiffs and members of the Class have each suffered damages that exceed One Hundred Dollars ($100.00), thereby satisfying Rule 23(a)(5), SCRCP.

<u>**FOR A FIRST CAUSE OF ACTION**</u>
**Declaratory Judgment—Statutorily Unauthorized Rate Imposition**
**On Behalf of the Class Against Santee Cooper**

97.     Plaintiffs restate and reiterate all preceding paragraphs as if specifically restated herein.

98.     Plaintiffs and the Class seek a declaratory judgment pursuant to S.C. Code Ann. § 15-53-30 and Rule 57, SCRCP, for the purposes of determining a question of actual controversy between the parties. S.C. Code Ann. § 15-53-30 provides that any party whose rights or status have been affected by a statute may have determined any question of construction or validity arising under the statute, and obtain a declaration of rights, status, or other legal relations thereunder.

99.     Plaintiffs and the Class seek a declaration of rights under S.C. Code Ann. §§ 58-31-30(13), -55(A), -200, -360, and other such sections as may be applicable. Specifically, the Plaintiffs and the Class seek declarations as follows:

    a.     Imposition, collection, and expenditure of the rate increases associated with the voluntarily abandoned Project exceeded Santee Cooper's statutory authority because, under S.C. Code Ann. §§ 58-31-30(13), -360, rates and charges must be "for the use of the facilities" or "for the services rendered" or "for any commodities furnished by [Santee Cooper]." Plaintiffs and the Class will never use any energy produced by the voluntarily abandoned Project, receive services from the voluntarily abandoned Project, or benefit from any commodities associated with the voluntarily abandoned Project.

    b.     Imposition, collection, and expenditure of the rate increases associated with the abandoned Project exceeded Santee Cooper's statutory authority because, under S.C.

ELECTRONICALLY FILED - 2019 Jul 25 1:46 PM - HAMPTON - COMMON PLEAS - CASE#2017CP2500348

Code Ann. § 58-31-55(A)(3)(a), the rates must be "just and reasonable," which they were not in this case since they exceeded Santee Cooper's statutory authority; Santee Cooper woefully mismanaged the construction effort; and given the voluntary abandonment of the Project, Plaintiffs and the Class will never see any benefit (use, services, or commodities) despite having paid substantial sums of money.

      c.     Imposition, collection, and expenditure of the rate increases associated with the voluntarily abandoned Project exceeded Santee Cooper's statutory authority because S.C. Code Ann. § 58-31-200 does not authorize Santee Cooper to depart from the longstanding "used and useful" doctrine embraced by the South Carolina Supreme Court and S.C. Code Ann. §§ 58-31-30(13), -360 or to otherwise collect advanced financing associated with this Project.

      d.     Imposition, collection, and expenditure of the rate increases associated with the voluntarily abandoned Project exceeded Santee Cooper's statutory authority to the extent the mandatory sixty-day statutory notice prior to setting rates, under S.C. Code Ann. § 58-31-360, was either not provided or not adequately provided.

100.    Since Santee Cooper exceeded its statutory authority by imposing, collecting, and expending the unlawful rates, the amounts collected should be refunded, with interest, to Plaintiffs and the Class.

**FOR A SECOND CAUSE OF ACTION**
**Breach of Statutory Duties**
**On Behalf of the Class Against the Santee Cooper Board**

101.    Plaintiffs restate and reiterate all preceding paragraphs as if specifically restated herein.

102.    Plaintiffs and the Class have standing to bring this action pursuant to S.C. Code Ann. § 58-31-57 and South Carolina law, more generally.

103.    The Board, collectively, violated S.C. Code Ann. § 58-31-55(A) by, among other things, woefully mismanaging and overseeing the Project as set forth above, which ultimately was voluntarily abandoned at great cost to Santee Cooper and Plaintiffs.

104.    With regard to the Project, the Board failed to execute its decision making according to the "best interests" as defined by S.C. Code Ann. § 58-31-55(A)(3) in that the Board's

ELECTRONICALLY FILED - 2019 Jul 25 1:46 PM - HAMPTON - COMMON PLEAS - CASE#2017CP2500348

decisions severely undermined public confidence in Santee Cooper, the "financial integrity" of Santee Cooper, and "economic development and job attraction." The consequences of the Board's decisions regarding the Project have been so severe that the future of Santee Cooper is in question.

105.    The Board cannot benefit from the safe harbor language found in S.C. Code Ann. § 58-31-55(B) because the conditions of S.C. Code Ann. § 58-31-55(C) have been satisfied. Specifically, despite any protestation to the contrary and at all times relevant, the Board knew or should have known that there were profound problems with the viability of the Project from its outset, which only grew worse and worse over time.

106.    These statutory violations proximately caused Plaintiffs and the Class billions of dollars in monetary harm.

107.    Given the foregoing statutory violations, the Plaintiffs and the Class are entitled to monetary damages for the sums collected from Plaintiffs and the Class to pay costs associated with the Project, reasonable attorneys' fees and costs, and appropriate equitable relief pursuant to S.C. Code Ann. § 58-31-57.

**FOR A THIRD CAUSE OF ACTION**
**Breach of Fiduciary Duties**
**On Behalf of the Direct Subclass Against the Santee Cooper Board**

108.    Plaintiffs restate and reiterate all preceding paragraphs as if specifically restated herein.

109.    The direct Plaintiffs and the Direct Subclass have standing to bring this action pursuant to S.C. Code Ann. § 58-31-57 and South Carolina law, more generally.

110.    A fiduciary relationship exists between the direct Plaintiffs and the Direct subclass and the Santee Board because the customer classes repose special confidence in the Santee Board to oversee and manage the affairs of Santee Cooper. The Board knew or should have known

ELECTRONICALLY FILED - 2019 Jul 25 1:46 PM - HAMPTON - COMMON PLEAS - CASE#2017CP2500348

customers placed such confidence in its management, and the Board knowingly accepted this responsibility. The special circumstances characterizing this fiduciary relationship are further demonstrated by the substantial sums of money collected by the Board in the form of rates, the technical nature of the projects and efforts overseen by the Board, and the promises made by the Board to customers.

111.    The Board, collectively, breached its fiduciary duties to the direct Plaintiffs and the Direct Subclass by, among other things, woefully mismanaging and overseeing the Project as set forth above.

112.    The Board, collectively, breached its fiduciary duties to the direct Plaintiffs and the Direct Subclass by charging hundreds of millions of dollars via a series of statutorily improper rate increases, as discussed above, to pay costs associated with construction of the Project.

113.    The Board's decisions, actions, and inactions were not in good faith, were inconsistent with the care an ordinarily prudent person in a like position would exercise under similar circumstances, and were not in the best interests of Santee Cooper or its customers.

114.    These breaches proximately caused the direct Plaintiffs and the Direct Subclass monetary losses.

115.    Given the foregoing breaches, the direct Plaintiffs and the Direct Subclass are entitled to disgorgement of Santee Cooper's ill-gotten gains, namely the sums collected from the direct Plaintiffs and the Direct Subclass to pay costs associated with the Project, reasonable attorneys' fees and costs, and appropriate equitable relief pursuant to S.C. Code Ann. § 58-31-57.

### FOR A FOURTH CAUSE OF ACTION
**Breach of Contract or Breach of Implied Contract
On Behalf of the Direct Subclass Against Santee Cooper**

116.    Plaintiffs restate and reiterate all preceding paragraphs as if specifically restated

ELECTRONICALLY FILED - 2019 Jul 25 1:46 PM - HAMPTON - COMMON PLEAS - CASE#2017CP2500348

herein.

117.    A contractual relationship supported by valuable consideration exists between the direct Plaintiffs and the Direct Subclass and Santee Cooper. In exchange for the payment of monthly electricity rates, Santee Cooper, among other things, provides electricity service and, ensures the adequate supply of power, consistent with good utility practices.

118.    Beginning on January 1, 2009, a portion of the direct Plaintiffs' and the Direct Subclass's monthly electricity rates was specifically charged to pay financing costs associated with construction of the Project (*i.e.*, future power to serve future customers). Santee Cooper made a variety of promises to its customers concerning these charges including, but not limited to, that the Project would actually be built on time and on budget and ultimately provide reliable, affordable, and environmentally friendly electrical power, and that the Project was necessary to meet is customer's energy needs.

119.    Santee Cooper breached its contract with the direct Plaintiffs and the Direct Subclass by failing to adequately and competently manage the Project, and by ultimately abandoning it. Accordingly, Santee Cooper's customers will never receive any benefit from the Project despite having paid increased rates specifically designated for costs associated with the Project for over a decade.

120.    Santee Cooper breached its contract with the direct Plaintiffs and the Direct Subclass because the rates associated with the Project were neither just nor reasonable under the circumstances, nor in accord with good utility practices.

121.    Additionally, Santee Cooper breached the covenant of good faith and fair dealing, which accompanies all contracts under South Carolina law, by engaging in the conduct described above.

122.    As a result of these breaches, the direct Plaintiffs and the Direct Subclass have suffered substantial losses and are entitled to full compensation, including all direct and consequential damages and interest.

**FOR A FIFTH CAUSE OF ACTION**
**Unconstitutional Taking Under the South Carolina Constitution**
**On Behalf of the Class Against Santee Cooper**

123.    Plaintiffs restate and reiterate all preceding paragraphs as if specifically restated herein.

124.    Article I, Section 13(A) of the South Carolina Constitution prohibits state agencies, like Santee Cooper, from taking private property without just compensation and without providing "public use."

125.    Article I, Section 13(A) of the South Carolina Constitution further provides under no circumstances may private property ever be taken by the government for private use or economic development purposes without the owner's consent.

126.    Money is private property for the purposes of takings.

127.    Santee Cooper mandated customers pay increased rates associated with the construction of two nuclear reactors; however, these funds have never and will never provide any public use, service, or commodity for the benefit of customers due to the abandonment. The increased rates are not taxes, fees, or special assessments. Plaintiffs and the Class were forced to pay these unlawful, increased rates or risk the loss of electricity, which is a necessary feature of modern life, heath, and sanitation.

128.    The increased rates associated with the voluntarily abandoned Project constitute unconstitutional takings because they violate the just compensation and public use requirements under the South Carolina Constitution.

ELECTRONICALLY FILED - 2019 Jul 25 1:46 PM - HAMPTON - COMMON PLEAS - CASE#2017CP2500348

ELECTRONICALLY FILED - 2019 Jul 25 1:46 PM - HAMPTON - COMMON PLEAS - CASE#2017CP2500348

129.    Moreover, the Project would not have moved forward without the participation of and financial commitments by Santee Cooper. Despite the Project's abandonment and utter failure, SCANA's and SCE&G's shareholders have reaped and will continue to reap substantial private profits. Had Santee Cooper not been involved in the Project, these private profits would not have been captured by SCANA's and SCE&G's shareholders. Simply put, Santee Cooper's involvement in the Project, specifically the funds collected from its customers, enabled and facilitated massive private profit for SCANA and SCE&G and a total loss for its own customers. As such, Santee Cooper's increased rates associated with the voluntarily abandoned Project amount to the taking of private property, without consent, for private benefit in violation of the South Carolina Constitution.

130.    Given the foregoing, Plaintiffs and the Class are entitled to the return of all monies collected and spent by Santee Cooper in violation of the South Carolina Constitution plus reasonable attorneys' fees and costs.

## FOR A SIXTH CAUSE OF ACTION
### Violation of the Due Process Under the South Carolina Constitution
### On Behalf of the Direct Subclass Against Santee Cooper

131.    Plaintiffs restate and reiterate all preceding paragraphs as if specifically restated herein.

132.    Article I, Section 3 of the South Carolina Constitution prohibits state agencies, like Santee Cooper, from depriving persons of, among other things, "property without due process of law."

133.    Santee Cooper violated Article I, Section 3 to the extent customers such as the direct Plaintiffs and the Direct Subclass were either not provided notice at all or provided insufficient notice (under the circumstances) and an opportunity to participate in any meaningful process prior

ELECTRONICALLY FILED - 2019 Jul 25 1:46 PM - HAMPTON - COMMON PLEAS - CASE#2017CP2500348

to the imposition, collection, and expenditure of the unlawful rates at issue in this case.

134.    Santee Cooper further violated Article I, Section 3 to the extent material facts about the prospects and future of the construction effort were concealed or not communicated accurately during the various rate setting processes used by Santee Cooper.

135.    Santee Cooper further violated Article I, Section 3 to the extent the imposition, collection, and expenditure of the rates at issue in this case was a unilateral decision made by the Board with no oversight from any other agency, a foregone conclusion irrespective of any ratepayer advocacy, and without any meaningful process for customers to examine the merits of the rate increases under the circumstances or with the aid of material information Santee Cooper possessed or could reasonably access.

136.    Given the foregoing, the direct Plaintiffs and the Direct Subclass are entitled to the return of all monies collected and spent by Santee Cooper in violation of the South Carolina Constitution plus reasonable attorneys' fees and costs.

### FOR A SEVENTH CAUSE OF ACTION
### Breach of Contract or Breach of Implied Contract
### On Behalf of the Cooperative Subclass Against Santee Cooper and Central

137.    Plaintiffs restate and reiterate all preceding paragraphs as if specifically restated herein.

138.    Santee Cooper and Central sell power to the Distribution Cooperatives, including Palmetto.

139.    Santee Cooper and Central understand that when power is sold to the Distribution Cooperatives, the intended beneficiaries of the purchased power are the indirect cooperative Plaintiffs and the Cooperative Subclass.

140.    As the intended beneficiaries of contracts between Santee Cooper, Central, and the

ELECTRONICALLY FILED - 2019 Jul 25 1:46 PM - HAMPTON - COMMON PLEAS - CASE#2017CP2500348

Distribution Cooperatives, the indirect cooperative Plaintiffs and the Cooperative Subclass entered into contracts indirectly with Santee Cooper and Central, pursuant to which Santee Cooper and Central were to provide the Distribution Cooperatives safe, reliable, and steady electrical power and to charge only those charges that were necessary and allowed by law for that service. In exchange, the indirect cooperative Plaintiffs and the Cooperative Subclass, in order to have electrical power, have been forced to pay and have paid electricity rates. These payments inured to the benefit of all Defendants.

141.    Santee Cooper and Central breached their contracts with the indirect Plaintiffs and the Cooperative Subclass by passing along charges in the form of increased rates associated with the Project, which has now been abandoned. This breach violates both explicit terms of governing statutes, the terms of the governing agreements for the cooperatives, the terms of the contracts for service with the Plaintiffs, and the implied terms of the contracts with the Plaintiffs, including the implied obligations of good faith and fair dealing.

142.    Santee Cooper and Central continue to pass along these charges without a proper legal basis.

143.    As a result of the breaches of contract by Santee Cooper and Central, the indirect Plaintiffs and the Cooperative Subclass have suffered substantial losses and are entitled to full compensation, including all direct and consequential damages and interest.

**FOR AN EIGHTH CAUSE OF ACTION**
**Breach of Contract or Breach of Implied Contract**
**On Behalf of the Palmetto Subclass Against Palmetto**

144.    A contractual relationship supported by valuable consideration exists between Mrs. Cook and the Palmetto Subclass and Palmetto. In exchange for the payment of monthly electricity rates, Palmetto, among other things, provides electricity service and, ensures the adequate supply

ELECTRONICALLY FILED - 2019 Jul 25 1:46 PM - HAMPTON - COMMON PLEAS - CASE#2017CP2500348

of power, consistent with good utility practices.

145.    Beginning on January 1, 2009, a portion of Mrs. Cook and the Palmetto Subclass's monthly electricity rates was specifically charged to pay costs associated with construction of the Project (*i.e.*, future power to serve future customers).

146.    Palmetto breached its contract with Mrs. Cook and the Palmetto Subclass by failing to exercise its rights to ensure the Project was adequately and competently managed. Accordingly, the Palmetto Subclass will never receive any benefit from the Project despite having paid increased rates specifically designated for costs associated with the Project for over a decade.

147.    Palmetto breached its contract with Mrs. Cook and the Palmetto Subclass because the rates associated with the Project were neither just nor reasonable under the circumstances, nor in accord with good utility practices.

148.    Additionally, Palmetto breached the covenant of good faith and fair dealing, which accompanies all contracts under South Carolina law, by engaging in the conduct described above.

149.    As a result of these breaches, Mrs. Cook and the Palmetto Subclass have suffered substantial losses and are entitled to full compensation, including all direct and consequential damages and interest.

## FOR A NINTH CAUSE OF ACTION
### Negligence and/or Gross Negligence
### On Behalf of the Class Against Santee Cooper

150.    Plaintiffs restate and reiterate all preceding paragraphs as if specifically restated herein.

151.    As set forth above and herein, Santee Cooper was a partner and owner of the Project, the purpose of which was for the express benefit of Santee Cooper customers.

152.    As a partner and co-owner of a major project created for the benefit of its customers,

ELECTRONICALLY FILED - 2019 Jul 25 1:46 PM - HAMPTON - COMMON PLEAS - CASE#2017CP2500348

Santee Cooper had a duty to use due and reasonable care in one or more of the following particulars:

a.      Selecting competent agents to work on behalf of Santee Cooper customers;

b.      Providing adequate supervision to the progress of Project construction;

c.      Providing adequate supervision of the Project budget;

d.      Exiting the Project or that portion of the Project Santee deemed "unnecessary" for utility purposes;

e.      Ensuring adequate policies and procedures existed regarding construction of the Project;

f.      In the event such policies or procedures were in place, ensuring compliance with the policies and procedures;

g.      Ensuring the Project was construed according to industry standards and/or good utility practices;

h.      Ensuring accurate and transparent representations were made about the Project to members of the public, bondholders, and regulatory entities;

i.      Ensuring only those costs necessary to the reliable provision of electric service were assessed as to direct and indirect customers; and

j.      Such other duties as may be determined during discovery or the trial of this matter.

153.    As set more fully herein, Santee Cooper breached its duties in one or more of the following particulars:

a.      Failing to use due and reasonable care in oversight and management of the Project;

b.      Failing to select competent agents with specific knowledge in the field of nuclear construction;

c.      Failure to exercise reasonable quality assurance and other methods to ascertain the actual status of the Project;

d.      Failing to adhere to good utility practices with regard to the Project, including requiring customers to pay for a Project after a point in time the Project, or a part

ELECTRONICALLY FILED - 2019 Jul 25 1:46 PM - HAMPTON - COMMON PLEAS - CASE#2017CP2500348

thereof, had been deemed "unnecessary" for the provision of electric service;

e.      Failing to adequately monitor and/or control the budget and construction progress on the Project; and

f.      Such other particulars as may be revealed through discovery or a trial of this case.

154.    As a result of Santee Cooper's conduct as set forth herein, Plaintiffs lost the use of Units 2 and 3, and will receive neither these units in the future nor the associated benefits of clean, efficient, and cost effective energy, but will continue to incur costs associated with these units despite the loss of their use.  Plaintiffs also suffered property damage and loss of use in the form of their money wrongfully being taken to fund the Project.

155.    Santee Cooper's conduct as set forth herein constitutes the complete absence of care.

156.    As a direct and proximate result of Santee Cooper's negligent, grossly negligent, and reckless conduct, Plaintiffs and the Class have suffered substantial losses and are entitled to recover all actual and consequential damages, including, but not limited to, property damages and loss of use, punitive damages, and such other damages as may be determined in law or equity.

## FOR A TENTH CAUSE OF ACTION
### Negligence and/or Gross Negligence
### On behalf of the Cooperative Subclass Against Central

157.    Plaintiffs restate and reiterate all preceding paragraphs as if specifically restated herein.

158.    At all times relevant to this Complaint, Central was charged with management and decision making for the benefit of the customers of the Distribution Cooperatives, consistent with good utility practices.

159.    Central had a duty to exercise due and reasonable care and to protect the interests

ELECTRONICALLY FILED - 2019 Jul 25 1:46 PM - HAMPTON - COMMON PLEAS - CASE#2017CP250034B

of Distribution Cooperative customers.

160.     As set forth herein and above, Central breached its duty to exercise due and reasonable care, in one or more of the following particulars:

      a.     Failing to adequately monitor the Project to ensure construction was proceeding according to schedule;

      b.     Failing to adequately monitor the use of customer funds collected for Project financing;

      c.     Allowing for customer financing to continue on the Project despite knowledge that the Project was not proceeding on budget and on schedule;

      d.     Authorizing the additional payment of $175 million toward the Project after Central knew or should have known the Project was no longer viable; and

      e.     Such other particulars as may be revealed during discovery or trial of this matter.

161.     As a result of Central's conduct as set forth herein, the indirect Plaintiffs and the Cooperative Subclass lost the use of Units 2 and 3, and will receive neither these units in the future nor the associated benefits of clean, efficient, and cost effective energy, but will continue to incur costs associated with these units despite the loss of their use.  Plaintiffs and the Cooperative Subclass also suffered property damage and loss of use in the form of their money wrongfully being taken to fund the Project.

162.     Central's conduct as set forth herein constitutes the complete absence of care.

163.     As a direct and proximate result of Central's negligent, grossly negligent, and reckless conduct, the indirect Plaintiffs and the Cooperative Subclass have suffered substantial losses and are entitled to recover all actual and consequential damages, including, but not limited to, property damages and loss of use, punitive damages, and such other damages as may be determined in law or equity.

ELECTRONICALLY FILED - 2019 Jul 25 1:46 PM - HAMPTON - COMMON PLEAS - CASE#2017CP2500348

## FOR AN ELEVENTH CAUSE OF ACTION
### Negligence and/or Gross Negligence
### On behalf of the Palmetto Subclass Against Palmetto

164.    Plaintiffs restate and reiterate all preceding paragraphs as if specifically restated herein.

165.    At all times relevant to this Complaint, Palmetto had ample opportunity to discover and protect its customers from the waste and mismanagement at the Project.

166.    Palmetto had a duty to exercise due and reasonable care and to protect the interests of its customers.

167.    As set forth herein and above, Palmetto breached its duty to exercise due and reasonable care, in one or more of the following particulars:

      a.    Failing to adequately monitor the Project to ensure construction was proceeding according to schedule;

      b.    Failing to adequately monitor the use of customer funds collected for Project financing;

      c.    Allowing for customer financing to continue on the Project despite knowledge that the Project was not proceeding on budget and on schedule; and

      d.    Such other particulars as may be revealed during discovery or trial of this matter.

168.    As a result of Palmetto's conduct as set forth herein, Mrs. Cook and the Palmetto Subclass lost the use of Units 2 and 3, and will receive neither these units in the future nor the associated benefits of clean, efficient, and cost effective energy, but will continue to incur costs associated with these units despite the loss of their use.  Mrs. Cook and the Palmetto Subclass also suffered property damage and loss of use in the form of their money wrongfully being taken to fund the Project.

169.    Palmetto's conduct as set forth herein constitutes the complete absence of care.

ELECTRONICALLY FILED - 2019 Jul 25 1:46 PM - HAMPTON - COMMON PLEAS - CASE#2017CP2500348

170.    As a direct and proximate result of Palmetto's negligent, grossly negligent, and reckless conduct, Mrs. Cook and the Palmetto Subclass have suffered substantial losses and are entitled to recover all actual and consequential damages, including, but not limited to, property damages and loss of use, punitive damages, and such other damages as may be determined in law or equity.

### FOR A TWELVTH CAUSE OF ACTION
**Negligence and/or Gross Negligence**
**On Behalf of the Class Against SCANA, SCE&G, and SCANA Services**

171.    Plaintiffs restate and reiterate all preceding paragraphs as if specifically restated herein.

172.    Pursuant to the Project, SCANA, SCE&G, SCANA Services, Marsh, Byrne, and Addison owed duties to Plaintiffs and the Class, including, but not limited to:

a.    The duty to exercise reasonable oversight and management of the Project;

b.    The duty to create and enforce appropriate policies and procedures regarding construction of the Project;

c.    The duty to adequately and accurately apprise Project owners, bondholders, shareholders, regulatory bodies, and members of the public of the status of the Project;

d.    The duty to exercise due care with regard to decisions made on the Project, including decisions to expand ownership of the Project to third parties;

e.    The duty not to impose unreasonable or exorbitant costs on financiers of the Project, including the Santee Cooper direct and indirect customers;

f.    The duty to ensure the Project was proceeding according to good utility practices;

g.    The duty to ensure the existence of a Project schedule;

h.    The duty to staff the Project with competent employees knowledgeable in the field of nuclear construction;

i.    The duty to supervise and ensure that monies collected from customers for the Project were not being squandered through poor construction practices or unreasonable

36

ELECTRONICALLY FILED - 2019 Jul 25 1:46 PM - HAMPTON - COMMON PLEAS - CASE#2017CP2500348

activities; and

       j.     Such other duties as may be determined during discovery or the trial of this matter.

173.    Defendants breached the duties set forth above in one or more of the following particulars:

       a.     Failing to use due and reasonable care in oversight and management of the Project;

       b.     Failing to create adequate policies and procedures with regard to construction and quality assurance on the Project;

       c.     In the event such policies existed, failing to enforce the policies;

       d.     Failing to make accurate, timely representations regarding the status of the Project to interested parties;

       e.     Preventing and/or interfering in the sale of Santee Cooper's ownership interest in the Project to competent and knowledgeable third parties;

       f.     Causing Santee Cooper customers to incur unreasonable and unnecessary costs associated with the Project, including costs attributable to SCE&G's 5% additional interest in the Project following the 2014 agreement to purchase a partial share of Santee Cooper's ownership interest;

       g.     Failing to adhere to good utility practices with regard to the Project, including failing to ensure a complete design and schedule and failing to adhere to state and federal engineering standards;

       h.     Failing to assure the existence of a Project schedule; and

       i.     Failing to have sufficient numbers of staff associated with the Project and staffing the Project with employees who did not have the requisite engineering or nuclear construction background necessary for the Project; and

       j.     Such other particulars as may be revealed through discovery or a trial of this case.

174.    As a result of Defendants' conduct as set forth herein, Plaintiffs lost the use of Units 2 and 3, and will receive neither these units in the future nor the associated benefits of clean, efficient, and cost effective energy, but will continue to incur costs associated with these units

ELECTRONICALLY FILED - 2019 Jul 25 1:46 PM - HAMPTON - COMMON PLEAS - CASE#2017CP2500348

despite the loss of their use. Plaintiffs also suffered property damage and loss of use in the form of their money wrongfully being taken to fund the Project.

175.    Defendants' conduct as set forth herein constitutes the complete absence of care.

176.    As a direct and proximate result of Defendants' negligent, grossly negligent, and reckless conduct, Plaintiffs have suffered substantial losses and are entitled to recover all actual and consequential damages, including, but not limited to, property damages and loss of use, punitive damages, and such other damages as may be determined in law or equity.

## FOR A THIRTEENTH CAUSE OF ACTION
### *Respondeat Superior*
**On Behalf of the Class Against SCANA, SCE&G, and SCANA Services**

177.    Plaintiffs restate and reiterate all preceding paragraphs as if specifically stated herein.

178.    At all times relevant to this Complaint, Marsh, Byrne, and Addison, along with the members of the SCE&G New Nuclear Deployment ("NND") team, were employed by and through SCANA Services.

179.    As set forth above and herein, Marsh, Byrne, and Addison, and members of the SCE&G NND team, were responsible for oversight, quality control, quality assurance, and management of the Project.

180.    In addition, at all times relevant to this Complaint, Marsh, Byrne, and Addison served as the public face of the Project on behalf of SCE&G.

181.    Marsh, Byrne, and Addison, and the remaining members of the SCE&G NND team failed to exercise due and reasonable care regarding their management, oversight, quality assurance, and project protocols, made statements regarding the continued utility and viability of the Project with a reckless disregard as to the veracity of the statements, and failed to otherwise

ELECTRONICALLY FILED - 2019 Jul 25 1:46 PM - HAMPTON - COMMON PLEAS - CASE#2017CP2500348

appropriately staff the Project and allow entry into the Project of competent third party purchasers.

182.    During the interim of the Project, Marsh, Byrne, and Addison were operating in the course and scope of their employment with SCANA Services.

183.    Accordingly, SCANA Services is responsible for each and every action of Marsh, Byrne, and Addison that occurred during the course and scope of their employment.

184.    Plaintiffs were harmed as a direct and proximate result of the negligent conduct of Marsh, Byrne, and Addison and the negligent conduct of members of the SCE&G NND team.

185.    As a result, Plaintiffs are entitled to recover actual, consequential, and punitive damages, along with such other relief in law or equity as may exist.

### FOR A FOURTEENTH CAUSE OF ACTION
**Unjust Enrichment / Money Had and Received**
**On Behalf of the Class Against Defendants**

186.    Plaintiffs restate and reiterate all preceding paragraphs as if specifically restated herein.

187.    Plaintiffs and the Class conferred a non-gratuitous benefit on Defendants in the form of increased rates associated with the Project. Defendants promised Plaintiffs and the Class a variety of benefits in exchange for the increased rates, namely cheaper, cleaner, and more dependable nuclear power. Plaintiffs and the Class had no choice but to pay the increased rates or else run the risk of losing their electricity, which is an essential feature of modern life and human health and sanitation.

188.    Defendants realized value from the increased funds by, among other things, using them to directly or indirectly purchase goods, materials, services, and other items of value in connection with the Project. Additionally, the Project, which would not have proceeded as long as it did without the increased rates, generated economic and other value to Defendants, including

ELECTRONICALLY FILED - 2019 Jul 25 1:46 PM - HAMPTON - COMMON PLEAS - CASE#2017CP2500348

financial profit, increased stock value, bonuses, retirement benefits, and other corporate and personal value.

189.    Despite paying the increased rates and conferring benefits on Defendants, all of which have been retained and none of which have been disgorged, Plaintiffs and the Class will receive none of the promised benefits (or any benefits at all) due to the Project's abandonment. What is more, Plaintiffs and the Class stand to continue to suffer losses by continuing the pay the increased rates post-abandonment.

190.    Plaintiffs and the Class are entitled, as a matter of equity, to recover the increased rates associated with the Project and other relief deemed reasonable and appropriate by the Court.

### FOR A FIFTEENTH CAUSE OF ACTION
**Constructive Trust**
**On Behalf of the Class Against Defendants**

191.    Plaintiffs restate and reiterate all preceding paragraphs as if specifically restated herein.

192.    Plaintiffs and the Class reposed a special confidence in Defendants to use the monies they paid to build the Project. Defendants in equity and good conscience were bound to act in good faith and due regard to the interests of Plaintiffs.

193.    By accepting Plaintiffs' and the Class' funds, Defendants accepted the fiduciary relationship with regard to the management of the funds and the construction of the Project.

194.    Defendants have accepted Plaintiffs' and the Class' monies for the construction of the Project by charging them increased rates.

195.    Defendants were trusted with Plaintiffs' and the Class' monies to build the Project.

196.    Defendants knew, or should have known, that the Project was not feasible or viable, and that they were not spending Plaintiffs' and the Class' monies properly.

ELECTRONICALLY FILED - 2019 Jul 25 1:46 PM - HAMPTON - COMMON PLEAS - CASE#2017CP2500348

197.    Even with knowledge that the Project was over budget and was likely to fail, Defendants continued to collect monies from Plaintiffs and the Class.

198.    Defendants were managing the funds of Plaintiffs and the Class. Thus, Defendants owed a duty and/or fiduciary duty to Plaintiffs and the Class to prudently manage the monies and to properly oversee the Project.

199.    Defendants also concealed material issues with the Project from Plaintiffs and the Class while continuing to collect monies from them to pay for the Project.

200.    Defendants' actions in concealing the material issues with the Project while continuing to collect and spend Plaintiffs' and the Class' monies were fraudulent and in bad faith.

201.    Defendants' actions abused the confidence of Plaintiffs and the Class and were in violation of the fiduciary duty owed to Plaintiffs and the Class to properly spend their monies.

202.    Plaintiffs and the Class should be entitled to the return from Defendants of:

      a.    the entire Toshiba Settlement;

      b.    all profits, performance bonuses, retirement packages ("golden parachutes"), and other benefits associated with the Project received by Defendants;

      c.    all funds received from the sale of the Project or parts thereof; and

      d.    all increased rates that were paid associated with the Project.

203.    Defendants have a duty and obligation in equity to make restitution to Plaintiffs and the Class.

### FOR A SIXTEENTH CAUSE OF ACTION
**Equity**
**On Behalf of the Class Against Defendants**

204.    Plaintiffs restate and reiterate all preceding paragraphs as if specifically restated herein.

41

ELECTRONICALLY FILED - 2019 Jul 25 1:46 PM - HAMPTON - COMMON PLEAS - CASE#2017CP2500348

205.    "Courts have the inherent power to do all things reasonably necessary to insure that just results are reached to the fullest extent possible." *Ex Parte Dibble*, 279 S.C. 592, 595–96, 310 S.E.2d 440, 442 (Ct. App. 1983).

206.    Defendants' actions and inactions described herein represent an unprecedented travesty of mismanagement, misconduct, and waste. This is the most profound economic catastrophe in the history of the state. Meanwhile, Defendants and their officers, shareholders, parent companies, and employees have received undeserved performance bonuses, retirement packages, and other financial benefits despite the utter failure of the Project. Plaintiffs and the Class, all of whom are entirely innocent, have suffered substantial economic losses for which they deserve compensation under fundamental notions of justice and fairness.

207.    Given the foregoing, this Court should employ its inherent equitable powers to right past wrongs and fashion a just and appropriate remedy for Plaintiffs and Class.

## JURY TRIAL DEMANDED AND PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand a jury trial and pray for judgment against Defendants and that:

A.    The Court certify the Class and appoint the undersigned as Class Counsel;

B.    Plaintiffs and the Class recover the general and special compensatory damages determined to have been sustained by them;

C.    Plaintiffs and Class be awarded the just and proper equitable relief requested;

D.    Plaintiffs and the Class recover punitive damages in an amount to be determined;

E.    Plaintiffs recover the costs of this suit, including any expert witness fees and reasonable attorneys' fees; and

F.    The Court grants such other, further, or different relief as may be deemed just and

proper.

s/ *James L. Ward, Jr.*

Daniel A. Speights
A. Gibson Solomons, III
**SPEIGHTS & SOLOMONS**
100 Oak Street, East
Post Office Box 685
Hampton, SC 29924
Telephone: 803-943-4444

James L. Ward, Jr.
Ranee Saunders
Whitney Harrison
**McGOWAN, HOOD & FELDER, LLC**
321 Wingo Way, Suite 103
Mt. Pleasant, SC 29464
Telephone: 843-388-7202

Clayton B. McCullough
Ross A. Appel
**McCULLOUGH KHAN, LLC**
359 King St., Ste. 200
Charleston, SC 29401
Telephone: 843-937-0400

J. Preston Strom, Jr.
Jessica L. Fickling
John R. Alphin
**STROM LAW FIRM, LLC**
2110 Beltline Boulevard
Columbia, SC 29204
Telephone: 803-252-4800

Terry E. Richardson, Jr.
Edward J. Westbrook
Jerry H. Evans
Daniel S. Haltiwanger
**RICHARDSON, PATRICK, WESTBROOK & BRICKMAN, LLC**
P.O. Box 1368
Barnwell, SC 29812
Telephone: 803-541-7850

**ATTORNEYS FOR PLAINTIFFS**

ELECTRONICALLY FILED - 2019 Jul 25 1:46 PM - HAMPTON - COMMON PLEAS - CASE#2017CP2500348

ELECTRONICALLY FILED - 2019 Jul 25 1:46 PM - HAMPTON - COMMON PLEAS - CASE#2017CP2500348

Dated: July 25, 2019
Mt. Pleasant, South Carolina