# EXHIBIT C

**STEPHEN A. BYRNE**
**October 23, 2018**

```
STATE OF SOUTH CAROLINA
                              COURT OF COMMON PLEAS
COUNTY OF HAMPTON

RICHARD LIGHTSEY, LeBRIAN CLECKLEY, PHILLIP COOPER,
et al, on behalf of themselves and all others
similarly situated,

          Plaintiffs,

     vs.                    CASE NO. 2017-CP-25-00335

SOUTH CAROLINA ELECTRIC & GAS COMPANY, a Wholly
Owned Subsidiary of SCANA, SCANA CORPORATION and
the STATE OF SOUTH CAROLINA,

          Defendants.
SOUTH CAROLINA OFFICE OF REGULATORY STAFF,
          Intervenor.


DEPOSITION OF:    STEPHEN A. BYRNE

DATE:             October 23, 2018

TIME:             9:03 a.m.

LOCATION:         Haynsworth Sinkler Boyd, PA
                  134 Meeting Street, 3rd Floor
                  Charleston, SC

TAKEN BY:         Counsel for the Defendants

REPORTED BY:      PATRICIA L. THOMPSON,
                  Registered Professional Reporter
```

**STEPHEN A. BYRNE**
**October 23, 2018**

```
 1      A.    I would say that they had a myriad of
 2   issues at the Lake Charles facility.  Some of them
 3   dealt with the work force; some of them dealt with
 4   leadership; some of them dealt with quality and
 5   completeness.
 6               Certainly that facility had to deal
 7   with design changes coming from the designer, which
 8   was Westinghouse.  And the Nuclear Regulatory
 9   Commission did some inspections at that facility
10   and found some issues and were fairly critical of
11   the facility.
12      Q.    Did SCE&G take any actions to try to
13   resolve the issues that occurred at the Lake
14   Charles facility?
15      A.    Yes.  As I said earlier, the EPC
16   construction -- that the construct of that type of
17   contract will limit the owners' ability to force
18   changes, but certainly SCE&G or the owners sent to
19   the Consortium what we call project letters that
20   would outline changes that would need to be made.
21               The owners asked for a recovery plan
22   for that facility.  The owners also placed a
23   resident inspector at the facility to evaluate
24   quality and give realtime feedback on what was
25   going on there.  The owners asked for design
```

**STEPHEN A. BYRNE**
**October 23, 2018**

```
 1   engineers from Westinghouse to be placed in the
 2   facility rather than design issues being handed
 3   back and forth between the facility and Lake
 4   Charles and where Westinghouse was in Pennsylvania.
 5   It was thought that more realtime resolution of
 6   engineering issues would be of benefit.  And then
 7   we did press them to look at other suppliers other
 8   than this Lake Charles supplier.
 9              So I think within the confines of what
10   SCE&G was allowed to do we did do that.  The
11   leadership teams from both SCE&G and Santee Cooper
12   made multiple visits to the Lake Charles facility
13   along with Southern Company in some cases.  So it
14   was a show of force to let the Shaw team and the
15   CB&I team know that the owners of both projects
16   were not happy with what was going on at Lake
17   Charles.
18       Q.    At some point did SCE&G request that
19   some of the module fabrication occur at V.C. Summer
20   itself to try to alleviate some of the problems at
21   Lake Charles?
22       A.    Actually that was a suggestion that
23   came from the constructor, but SCE&G had to allow
24   that.  That was going to be a change to the
25   construction plan that was outlined.  And so the
```

**STEPHEN A. BYRNE**
**October 23, 2018**

```
 1    impacting the schedule.
 2         Q.    Okay.  And if we go on in your prefile
 3    testimony to Page 40 -- so we're now on Exhibit 15,
 4    Page 40.  There is a section called Disputed Costs
 5    in which you describe that SCE&G was challenging
 6    several categories of the increased costs.
 7         A.    That's correct.
 8         Q.    Describe for us what SCE&G was doing to
 9    challenge costs as reflected in your testimony.
10         A.    Doing a couple of things.  First off,
11    where the Consortium was making an attempt to bill
12    the company or invoice the company for things that
13    the owners thought were in the fixed or firm
14    category, those were being rejected.
15               Where the Consortium was invoicing
16    based on productivity factor issues or other things
17    that were contested invoices by the company, the
18    company was only going to pay 90% of those.  I
19    don't know if we get into liquidated damages or
20    not.
21               There were also some delays -- or
22    charges that were caused by the delay.  I think an
23    example was tents.  So the Consortium wanted to
24    bill the owners for storage tents.  In the owners'
25    minds the storage tents were only necessitated by
```

**STEPHEN A. BYRNE**
**October 23, 2018**

1  the delay and parts still show up, which we think
2  is a good thing, but now instead of going
3  immediately into the excavation they had to be
4  stored or staged somewhere.
5           So there were costs that were
6  inappropriate.  There were costs that were trying
7  to be passed on to the owners because of the delay
8  that were being rejected and then there were
9  contested invoices, whether contested based on the
10 fact that the Consortium didn't think -- or the
11 owners didn't think that the charges were
12 legitimate or the performance factor and other
13 ratios were not good that were only going to be
14 paid at 90%.
15     Q.     Page 43 of your prefile testimony,
16 Exhibit 15, you explain why these disputed costs
17 are properly included in the cost schedules.
18           At a high level, what is the answer to
19 that question?
20     A.     So that the company wouldn't be in
21 breach of the contract.  The contract had in it
22 provisions for contesting invoices, and so as to
23 not be in breach the company was going to pay some
24 of those invoices at the 90% level.  You know,
25 possibly a stretch to even withhold payments for

**STEPHEN A. BYRNE**
**October 23, 2018**

```
 1   some of those things, and that was certainly the
 2   Consortium's position.  But probably more risk in
 3   the payments that were completely withheld based on
 4   things like deficient invoices or claiming that the
 5   delay caused those and the company just wasn't
 6   going to pay them.
 7             So a couple of different categories
 8   there that were disputed, but the basic reason is
 9   because the company did not want to be in breach.
10   So they were paying the 90%.
11        Q.   What would happen if SCE&G was later
12   successful in challenging some of those costs that
13   it paid?
14        A.   Well, if the company was due any kind
15   of a refund, those would be passed back to the
16   consumer or the rate payer.
17        Q.   If you could turn back to Page 17 of
18   your prefile testimony, Mr. Byrne.
19        A.   17?
20        Q.   Exhibit 15, Page 17.  Back to the
21   challenges and risks that the project faces.  And
22   one of the issues that you raised in this section
23   of your testimony was the issue of maintaining a
24   working relationship with the Consortium while
25   enforcing the EPC contract.
```